UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA A. LEWIS, | | |
| Plaintiff, | | |
| v. | | No. 11 C 1806 |
| THE MARMON GROUP, LLC, | | Judge Thomas M. Durkin |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Debra Lewis, pro se, alleges that The Marmon Group, LLC ("Marmon") breached the contract Lewis had with Marmon to assist with Marmon's conversion to an electronic invoicing system when Marmon terminated the contract. R. 47.[1] Lewis also alleges that by terminating the contract Marmon (1) discriminated against her because she is African-American in violation of 42 U.S.C. § 1981, (2) retaliated against her for participating in a fraud investigation in violation of state law, and (3) violated the Illinois Whistle Blower Act. R. 47. Marmon has moved for summary judgment on all of Lewis's claims. R. 91. For the following reasons, Marmon's motion is granted, and Lewis's case is dismissed.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1] Lewis's complaint does not enumerate her claims as counts.

322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

Lewis was employed by Ajilon—a temporary employment service agency—and assigned to work for Marmon beginning in July 2005. Lewis states that her job responsibilities "included gathering, analyzing and validating requirements for the proposed new e-billing payment system for the Legal department," and "[p]articipate [sic] and oversee implementation of the new database (Stars)." R. 102 at 12 (¶ 3).[2] Robert Webb, Marmon's general counsel, testified by written deposition

---

[2] Marmon argues that Lewis's declaration should be stricken because it is unsigned and does not include language referring to the "penalty of perjury" mandated by 28 U.S.C. § 1746, which the Seventh Circuit has described as a "substantive" requirement necessary for consideration on summary judgment. R. 109 at 2-3 (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985)). As an initial matter, contrary to Marmon's contention, the copy of Lewis's declaration in the record is signed. R. 102 at 22. Further, the requirement in 28 U.S.C. § 1746 that the "penalty of perjury" language be included applies to "unsworn" declarations, and Lewis states that her declaration is "duly sworn." R. 102 at 12 (¶ 1). Moreover, Federal Rule of Civil Procedure 56(c)(4) describes the declarations that may be used to oppose summary judgment and does not include the requirements of 28 U.S.C. §

2

that Lewis was "primarily [responsible for] the processing and inputting of data from paper-based invoices received from law firms and other legal vendors for Asbestos-related claims, while the Legal Department was developing and transitioning to an e-billing system. Lewis's services also included transferring historical billing to the e-billing system." R. 110-1 at 45-46 (¶ 3).

In October 2007, Lewis informed Marmon that she would be moving to Mississippi and no longer working for Ajilon. Webb states in an affidavit that "[b]ecause the services [Lewis] was performing were still needed, [he] agreed for Lewis to continue performing them under a consulting contract directly with Marmon." R. 110-1 at 57 (¶ 8). On April 23, 2008, Lewis signed a contract with Marmon. *See* R. 93-1. The contract provided that Lewis would be paid $36.30 per hour. R. 93-1 ¶ 3. The contract also provided that it would "continue until terminated by either party," and Marmon could "at any time direct [Lewis] to stop working immediately on any project." *Id.* ¶ 5.

The contract did not specify the services Lewis was to perform, but provided that Lewis was "to furnish information and advice to [Marmon] with respect to such projects or assignments as may be agreed to by the parties." R. 93-1 ¶ 1. Lewis states that her "job responsibilities [under the contract] included working with [two] other third-party technology companies to implement [sic] Marmon's current bill

---

1746. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,* 657 F.3d 936, 964 n. 7 (9th Cir. 2011) (Kozinski, C.J., dissenting) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."). In any event, as the Court explains below, Marmon prevails on its motion even considering Lewis's declaration.

3

payment system over to CS Stars." R. 102 at 13 (¶ 7). Lewis has submitted emails in which she communicated with Webb regarding the "software charges" necessary to implement "electronic invoicing." R. 102 at 23-24. Webb testified, however, that "Lewis did not work on developing or implementing the e-billing system, but primarily on processing and inputting data from paper-based invoices until all retained law firms and legal vendors for Asbestos-related legal claims began submitting electronic invoices," R. 110-1 at 47 (¶ 11), and that he hired Lewis to "continue to process and input data from paper-based invoices until the law firms and legal vendors for Asbestos-related legal claims were transitioned to submitting their invoices in electronic format." R. 110-1 at 46 (¶ 3). Lewis's invoices for her compensation from January 2010 show that she spent most of her time running reports and entering invoices into the new system. *See* R. 102 at 37-38.

Lewis alleges that "[w]hite contractors were paid [two and a half] times the rate per hour then [sic] African American contractors for billing system conversion projects. Contractors paid [two and a half] times were Darlene Scarbarski [sic] and possibly other unknown white contractors." R. 47 at 6 (¶ 1). Darlene Sarbiewski was an employee of a consulting company called Integration Technologies. R. 110-1 at 59 (¶ 15); R. 93-8 at 4 (28:7-14). Lewis also alleges, "White Contractors who [sic] contracts were renewed were Prescient and possibly other unknown white contracts." R. 47 at 6 (¶ 3). Prescient was another consulting company Marmon hired. R. 110-1 at 59 (¶ 16); R. 93-8 at 11 (46:2-10). Lewis admits that she "has no knowledge of the rate of compensation Marmon paid to other contractors between

4

April 2008 and March 2, 2010, the time frame for which Lewis was an independent contractor at Marmon." R. 107 ¶ 32.

During the course of her work for Marmon, Lewis became suspicious that her direct supervisor, Laura Narvez, was involved in a scheme to defraud Marmon. R. 102 at 14 (¶ 10). Lewis states that she initially became suspicious due to invoices Narvez sent to her to process for a case that had already concluded. R. 102 at 16 (¶ 17). Several months later, in January 2009, Lewis and Narvez had a dispute about proper procedures for handling documents, which led to Lewis having a conversation with Webb. R. 102 at 17-18 (¶¶ 22-23). During this conversation Lewis told Webb about the questionable invoices. R. 102 at 17 (¶ 23). According to Lewis, Webb dismissed her concerns and expressed his full support of Narvez, describing her as his "Pit Bull." *Id.*

Several months later, on November 13, 2009, Lewis had another meeting with Webb. R. 102 at 19 (¶ 24); R. 110-1 at 61 (¶ 20). The parties agree that at this meeting Webb told Lewis that her contract would be terminated as of January 31, 2010. R. 102 at 19 (¶ 24); R. 110-1 at 61 (¶ 20). The parties disagree about the reason for Webb's decision to terminate Lewis's contract. Lewis alleges that "the e-billing project was not complete and that [she] had not even started developing certain important add-ons," R. 102 at 19 (¶ 24), and that she "never got the opportunity to start the setup for the electronic invoicing." *Id.* (¶ 36). Webb states, to the contrary, that he terminated Lewis's contract because Marmon expected all their "legal vendors working on asbestos claims . . . . to permanently go to electronic

5

invoicing in January 2010, which would eliminate the need for Lewis's processing of paper-based invoices." R. 110-1 at 60 (¶ 19). Webb's assertion that electronic invoicing was ready to begin in January 2010 is corroborated by emails Lewis submitted from July 2009 in which she told Webb that they were "getting started with the setup of Electronic Invoicing," R. 102 at 24, and in which Narvez told Webb that "we are good to go" on electronic invoicing. *Id.* at 23.

Lewis contends that Webb's explanation is pretextual because when she asked Webb why he was terminating her contract even though her project was not complete, they had the following exchange:

> Webb: "You know there has been a theft. I thought I had a guard dog in place, but sometimes no matter what you put in place, some people can find their way around it. You people want to be treated fair, but just don't get it, they give you [an] inch and you just want the whole damn mile. You people just feel it's a given and a free ride."
> Lewis: "What do you mean you people? Women?"
> Webb: [silence]
> Lewis: "Blacks?"
> Webb: "You got it."

R. 102 at 19 (¶¶ 24-25). Webb denies that he made any such statements to Lewis. R. 110-1 at 62 (¶ 24). Notably, the same day Webb had this exchange with Lewis (November 13), Webb also fired Narvez. R. 110-1 at 61 (¶ 22).

Lewis also alleges that she met with Webb again a week later and he apologized and said, "I have been made aware that you had nothing to do with the theft, but you have knowledge of how the [theft] took place." R. 102 at 19 (¶ 26). According to Lewis, Webb then said, "With your help, Marmon would be able to put

6

an insurance claim to recover the funds stolen by [Narvez]. You would qualify for the whistleblower pay out [sic] because you did try to bring this to my attention several times earlier this year." *Id.* Over the next several months, Lewis met with investigators to discuss what she knew about the fraud. *Id.* at 20-21 (¶¶ 27-30).

Lewis states that she continued to receive assignments from Marmon into February 2010. R. 102 ¶ 32. At the end of February, she was told that Marmon had decided to terminate her contract. *Id.* Lewis's last work for Marmon occurred on March 3, 2010. *Id.* Webb wrote a recommendation letter for Lewis dated February 4, 2010, stating, "With [Lewis's] assistance [Marmon has] progressed to electronic billing and her assignment is now complete." R. 110-1 at 18.

## Analysis

### I. Breach of Contract and Violation of the Illinois Whistle Blower Act

Lewis failed to respond to Marmon's arguments that summary judgment in Marmon's favor is warranted on her claims for breach of contract and violation of the Illinois Whistle Blower Act. For this reason, Lewis is deemed to have abandoned those claims. *See Herman v. Cent. States, Se. and Sw. Areas Pension Fund*, 423 F.3d 684, 690 (7th Cir. 2005) (citing *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) ("[B]ecause [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment . . . his negligence claim is deemed abandoned.")).

In any event, no reasonable juror could conclude that Marmon breached its contract with Lewis. The contract provided that Marmon could "at any time direct

7

[Lewis] to stop working immediately on any project." R. 93-1 ¶ 5. Thus, Marmon's decision to terminate Lewis's contract is not a breach of the contract.

Additionally, no reasonable juror could find that Marmon violated the Illinois Whistleblower Act. The Act provides that "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). Lewis spoke with law enforcement concerning what she knew about the fraud on Marmon. But she did so at Marmon's behest. "Retaliate" means, "To return or repay in kind (an injury, insult, etc.)." *See* Oxford English Dictionary, www.oed.com. Since Lewis was complying with Marmon's directions by speaking with investigators, her speaking out did not injure Marmon such that Marmon would have reason to cause her injury in return. Moreover, Lewis does not argue, and there is no evidence in the record to indicate, that Marmon (or Webb) was unhappy with what Lewis communicated to law enforcement. Without any opposition from Marmon to Lewis's communications with law enforcement there is no basis to say that Marmon "retaliated" against Lewis. Thus, the Court grants summary judgment to Marmon on Lewis's Illinois Whistleblower Act claim.[3]

---

[3] Marmon also argues that Lewis is not an "employee" for purposes of the Illinois Whistleblower Act. The Act defines "employee" as "any individual who is employed on a full-time, part-time, or contractual basis by an employer." 740 ILCS 174/5. This definition of "employee" appears to include Lewis because it refers to a "contractual" relationship between "employer" and "employee," and Lewis had a contract with Marmon. Marmon argues to the contrary, but does so without addressing the "contractual basis" language from the statute or citing any authority holding that

## II. Retaliatory Discharge

Lewis admits that she was an independent contractor. R. 102 at 1 (¶ 4). Illinois law does not recognize a claim for retaliatory discharge by independent contractors. *See Gu v. Provena St. Joseph Med. Ctr.*, 2012 WL 699535, at *3 (N.D. Ill. Feb. 29, 2012) ("Under Illinois law, an independent contractor cannot bring a retaliatory discharge claim against the entity that hired the contractor." (citing *New Horizons Electronics Marketing, Inc. v. Clarion Corp. of Am.*, 561 N.E.2d 283, 285 (Ill. App. Ct. 2d Dist. 1990))). Therefore, Lewis's retaliatory discharge claim is dismissed.

Even if Illinois law recognized a claim for retaliatory discharge by independent contractors, there is insufficient evidence to find that Marmon retaliated against Lewis "for [her] acivities." *Turner v. Mem. Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). As discussed with respect to Lewis's Illinois Whistle Blower Act claim, there is no evidence in the record to indicate that Lewis injured Marmon in some way to give Marmon cause to injure her in return. Without such evidence, Lewis's claim must fail.

## III. Discrimination in Violation of 42 U.S.C. § 1981

Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens." The phrase "'make and enforce contracts' includes

---

the Illinois Whistleblower Act does not apply to independent contractors like Lewis. Thus, the Court's grant of summary judgment to Marmon on Lewis's Illinois Whistleblower Act claim is not based on the Act's definition of "employee."

9

. . . termination of contracts." 42 U.S.C. § 1981(b). Claims under 42 U.S.C. § 1981 are analyzed "in the same manner as claims brought pursuant to Title VII of the Civil Rights Act." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). The "central question at issue is whether the employer acted [adversely against the plaintiff] on account of the plaintiff's race." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). A plaintiff can answer this question according to either of two "methods" of proof. The "direct method" is nothing more than relying on any evidence—whether direct or circumstantial—that "link[s] an adverse employment action to an employer's discriminatory animus." *Id.* at 995. The indirect method is "a particular way of using circumstantial evidence at the summary judgment stage," *id.* at 996, that requires the plaintiff to establish a *prima facie* case of discrimination, and then show that any non-discriminatory reasons for the adverse employment action "were dishonest or phony," or pretextual. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). Whether evaluated according to the direct or indirect method, circumstantial evidence that requires "guesswork and speculation [is] not enough to avoid summary judgment." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012).

### A. Webb's Comments

Lewis's strongest evidence of discrimination are the biased comments about African-Americans she alleges Webb made on November 13 when he told her Marmon would terminate her contract on January 31. *See* R. 108 at 6. Although

10

"'[s]tray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination,'" a biased "remark . . . close in time and in substance to the alleged act of discrimination" can support such an inference. *Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003) (quoting *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001)); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Lewis argues that Webb's comments are sufficient evidence to defeat summary judgment because Webb terminated her contract at the same time he made the comments. But Lewis's timing argument has two flaws: (1) Webb wanted her to work for an additional two months beyond the date Lewis says he made the discriminatory comments; and (2) Lewis in fact worked another month beyond the initial deadline Webb set. If Webb's primary motivation was discriminatory animus he would have terminated Lewis's contract immediately on November 13. But Webb's decision to keep Lewis on through the end of January shows that he was motivated primarily by Marmon's needs (whether for Lewis's services or her assistance with the fraud investigation). Moreover, Lewis actually worked until March 3. The fact that Marmon continued Lewis's at-will contract beyond the original termination date indicates that Marmon required her services and that this was the primary motivation in determining whether Marmon continued Lewis's contract.

11

The fact that Webb was responsible for hiring Lewis in the first place is also evidence that Webb's decision to terminate Lewis's contract was not motivated by discriminatory animus. The Seventh Circuit has held that "if the decision maker was unbiased when he hired or promoted the plaintiff, it's reasonable to infer that he was unbiased when he later fired the plaintiff." *Perez*, 731 F.3d at 709. Hypothetically, if Webb had not originally hired Lewis, the time delay between Webb's comments and the final termination date of Lewis's contract would not necessarily destroy the causal connection between the comments and Lewis's contract termination. One could conceive of a new manager taking over and deciding to systematically fire all the African-American employees as convenient moments arose over time. But the fact that Webb hired Lewis demonstrates that he was willing to contract with African-Americans if he felt it was in Marmon's best interests. This evidentiary inference, combined with the fact that Webb delayed Lewis's termination until a date when it was convenient for Marmon demonstrates that Marmon's business needs, and not Lewis's race, motivated the termination of her contract.

Lewis argues that Webb's assertion that Lewis's contract was terminated because "Marmon expected all [law firms and legal vendors working on asbestos claims] to permanently go to electronic invoicing in January 2010, which would eliminate the need for Lewis's processing of paper-based invoices," R. 107 ¶ 33, is pretextual because she "never got the opportunity to start the setup for the electronic invoicing." R. 102 at 22 (¶ 36). Lewis's assertion, however, is contradicted

by emails from July 2009 that she submitted with her declaration. On July 30, 2009, Lewis sent Webb and Narvez an email seeking Webb's approval of "getting started with the setup of Electronic Invoicing." R. 102 at 24. In this email, Lewis explained, "Once we have approved [sic] that the feed is working we will then need to give Formal Notice to each Law Firm when they will be expected to start sending their invoicing [e]lectronically." *Id.* Webb responded on July 31 by asking whether there were "any additional software charges or other increased expenses to do this," and Narvez replied, "I think we are good to go," and Lewis confirmed. *Id.* at 23. These emails show that Lewis did in fact have the "opportunity to start the setup for the electronic invoicing," and the "setup" began five months before Webb asserts that the process was complete. In addition to the emails, Webb's assertion that the conversion to electronic billing was complete such that Lewis's services were no longer required is corroborated by the reference letter Webb provided to Lewis that stated that Marmon had "progressed to electronic billing and [Lewis's] assignment is now complete." R. 110-1 at 18. This letter is evidence of Webb's motivation during the relevant time period.

This contemporaneous documentary evidence—both the emails and the reference letter—negates the evidentiary value of Lewis's statements that she was denied the opportunity to finish the project she was hired to complete. Other than her own assertions, which are belied by the documentary evidence, Lewis has presented no evidence that Webb's explanation for terminating Lewis's contract is

13

pretextual. There is insufficient evidence for a reasonable jury to find that Lewis's contract was terminated because she is African-American.[4]

B.  **Similarly Situated Contractors**

Lewis argues that white contractors—specifically Darlene Sarbiewski of Integration Technologies, and contractors from a company called Prescient—were paid more than she was. Lewis admits, however, that she does not know how much these other contractors were paid. R. 107 ¶ 32. Thus, there is no evidence in the record that Lewis was paid less than other independent contractors.

Moreover, it is undisputed that, unlike the contract Marmon had with Lewis, Marmon did not have contracts directly with Sarbiewski or any individual contractors from Prescient. Instead, Marmon had contracts with Integration Technologies and Prescient, which are corporations. The contracts with these corporations are of a different kind entirely from Lewis's contract. Marmon paid Integration Technologies and Prescient for their services, and Integration Technologies and Prescient paid the individuals they assigned to provide services to Marmon. There is no evidence in the record regarding the fees Marmon paid to Integration Technologies and Prescient, and even if this information was in the

---

[4] Lewis also alleges that she suffered an adverse employment action when Marmon paid her late on two occasions. *See* R. 93-8 at 50 (187:1-5). Lewis does not specify how late the payments were. The Court questions whether such allegations amount to an adverse employment action. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) ("actual injury" is necessary for there to be "materially adverse employment action"). Nonetheless, even if the late payments Lewis describes are adverse employment actions, Lewis has not submitted any evidence that white employees or contractors were paid on time more often than she was. This evidence is insufficient to defeat summary judgment.

record, it is not indicative of what those companies paid the individuals they hired out. Furthermore, even if there was such evidence in the record, it is irrelevant to the wages or salaries Marmon directly paid to its employees, because Marmon does not control what Integration Technologies and Prescient pay their employees. For these reasons, employees of Integration Technologies and Prescient are not proper comparators for Lewis, and cannot constitute evidence of discrimination, no matter what they were paid.

There also is no evidence in the record that Marmon knew the race of the individuals Integration Technologies or Prescient assigned to provide services to Marmon. And of course corporations do not have racial characteristics. Since Marmon's contracts with Integration Technologies and Prescient cannot be associated with intent by Marmon to pay white contractors more than African-American contractors, these contractors cannot serve as comparators for Lewis and are not evidence of discriminatory animus on Marmon's part.

## Conclusion

For the foregoing reasons, Marmon's motion for summary judgment, R. 91, is granted, and Lewis's case is dismissed.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: September 3, 2014